UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
JOSE RAFAEL URENA,

         *Pro Se* Plaintiff,

    - against -

ROBERT BEAUDOUIN, M.D.,

        Defendant.
---------------------------------------X

**MEMORANDUM & ORDER**

09-CV-01107 (KAM)(LB)

**MATSUMOTO, United States District Judge:**

        On December 9, 2008, Jose Urena ("plaintiff")
commenced this *pro se* action in connection with the medical
treatment he received for bladder cancer while incarcerated in
2006 at the Metropolitan Detention Center in Brooklyn, New York,
a federal detention center ("the MDC"). Presently before the
court is the motion for summary judgment filed by defendant
Robert Beaudouin, M.D. ("Dr. Beaudouin" or "defendant") on the
sole remaining cause of action in this case, plaintiff's claim
for alleged constitutional violations relating to his medical
care at the MDC, pursuant to *Bivens v. Six Unknown Named Agents
of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971)
("*Bivens*") against Dr. Beaudouin. For the reasons set forth
below, Dr. Beaudouin's motion for summary judgment is granted in
its entirety.

<u>**BACKGROUND**</u>

The facts of this case have been discussed in detail in the court's prior orders. Accordingly, familiarity with the background of the case is presumed, and only those facts directly relevant to the instant motion will be recited in this Memorandum and Order.

## I. Procedural History

There has been extensive prior motion practice in Mr. Urena's case. On December 9, 2008, plaintiff commenced this *pro se* action in the Southern District of New York against the MDC; Dr. Beaudouin, who is a physician at the MDC; Yan Wolfson, M.D. ("Dr. Wolfson"), a physician at New York Downtown Hospital ("NYDH"); and NYDH. (*See generally* Compl., ECF No. 4-3). The court interpreted Mr. Urena's original complaint to allege constitutional violations pursuant to 42 U.S.C. § 1983 and *Bivens*, and negligence and medical malpractice claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq.*, and New York State law. *See Urena v. Wolfson*, No. 09-CV-1107, 2010 WL 5057208, at *1 (E.D.N.Y. Dec. 6, 2010) ("*Urena I*"). After the case was transferred to this court on March 11, 2009, an Amended Complaint was filed on November 2, 2009 (ECF No. 45),[1]

---

[1] Unless otherwise indicated any discussions of plaintiff's complaint refer to the Amended Complaint. Plaintiff moved to file a second amended complaint; however, Judge Bloom recommended that the motion to amend be denied and the undersigned agreed, adopting Judge Bloom's Report and Recommendation on February 29, 2012. (*See* ECF Nos. 133, 159.)

and discovery was completed, the MDC and Dr. Beaudouin moved to dismiss and for summary judgment (ECF No. 65) and Dr. Wolfson and the NYDH also moved to dismiss and for summary judgment (ECF Nos. 74, 79). In an opinion dated December 6, 2010, the court granted Dr. Beaudouin, Dr. Wolfson and NYDH's motions in part and denied them in part and granted the MDC's motion in its entirety, dismissing plaintiff's constitutional claims against the MDC, NYDH and Dr. Wolfson and his FTCA claims against the MDC and Dr. Beaudouin.[2] *See generally Urena I*, 2010 WL 5057208. The court ruled that the constitutional claims against Dr. Beaudouin would proceed, as would the state law tort claims against NYDH and Dr. Wolfson. *Id.*

Dr. Wolfson and NYDH subsequently renewed their motions for summary judgment (ECF Nos. 135, 146), and the undersigned granted those motions on March 20, 2012, dismissing all claims against Dr. Wolfson and NYDH. *See Urena v. Wolfson*, No. 09-CV-1107, 2012 WL 958529 (E.D.N.Y. Mar. 20, 2012) ("*Urena II*"). The court denied, however, a motion made by Dr. Beaudouin for reconsideration of the court's denial of summary judgment predicated on the government's argument that plaintiff failed to exhaust administrative remedies for his *Bivens* claim. (ECF Nos. 142, 164.)

---

[2] Mr. Urena did not name the United States in either his original or amended complaints; however, the court liberally construed his FTCA claims as being asserted against the United States. *Urena I*, 2010 WL 5057208, at *12.

Following a stay of the case (*see* Order dated July 23, 2012), Dr. Beaudouin again moved for summary judgment on plaintiff's remaining constitutional claim against him. (Def. Mot. Summ. J., ECF No. 209.) Plaintiff filed opposition to the motion (Pl. Opp'n, ECF No. 208), and defendant replied (Def. Reply, ECF No. 217).

## II. Undisputed Facts[3]

The following facts are undisputed and supported by admissible evidence, unless otherwise noted. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").

Plaintiff was an inmate at the MDC between July 6, 2005 and March 21, 2007. (Def. R. 56.1 Stmt. ¶ 1, ECF No. 211.) His medical treatment during this period was extensive, however, and the following description of plaintiff's medical treatment

---

[3] As set forth in Local Civil Rule 56.1(c), "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." L. Civ. R. 56.1(c). In addition, Local Civil Rule 56.2 requires that notice be sent to *pro se* parties by the party moving for summary judgment. Here, defendant complied with Rules 56.1 and 56.2 by serving statements and notice on plaintiff. (ECF No. 216.) Plaintiff did not submit a correspondingly numbered document responding to defendants' 56.1 statements. Instead, he appears to have objected to statements made in Dr. Beaudouin's affidavit submitted in support of the instant motion and to two paragraphs of defendant's Rule 56.1 Statement. (*See* Pl. Opp'n 12-18.) Although the majority of statements in defendant's Rule 56.1 submission are technically deemed admitted for the purposes of this motion, the court has liberally construed plaintiff's opposition papers and has considered the objections he makes to the facts presented by defendant.

at MDC will focus on his bladder condition at issue in this action. From July 8, 2005 to June 23, 2006, plaintiff was treated by MDC medical staff for several ailments, including but not limited to diabetes and tooth pain. (*Id.* ¶¶ 2-6, 8, 11-14.) A year after his arrival at MDC, on July 7, 2006, plaintiff made what appears to be his first complaint related to his bladder. (*See id.* ¶ 15.) At this time, plaintiff was housed in the East Tower of the MDC, where Dr. Beaudouin was stationed. (*See* Decl. of Robert Beaudouin, M.D. ("Beaudouin Decl.") ¶ 6, ECF No. 212.) Plaintiff informed Dr. Beaudouin that he had observed blood and pus in his urine and blood following bowel movements. (Def. R. 56.1 Stmt. ¶ 15; *see also* Abell Decl., Ex. A at BOP00016, 19 (Dr. Beaudouin's notes dated July 7, 2006).)[4] Dr. Beaudouin examined plaintiff and diagnosed plaintiff with hemorrhoids and prescribed hydrocortisone cream. (*Id.*)

One week later, on July 14, 2006, analysis of plaintiff's urine was performed, which indicated several abnormalities, including the presence of occult blood and bacteria. (Def. R. 56.1 Stmt. ¶ 16; *see also* BOP45 (copy of the urinalysis results).) On July 19, 2006, Dr. Beaudouin reviewed the test results and indicated that plaintiff should follow up

---

[4] "Abell Decl." refers to the declaration of defendant's attorney, Assistant United States Attorney Kenneth M. Abell. Attached as Exhibit A to Mr. Abell's declaration is a copy of plaintiff's medical file for the period during which he was incarcerated at the MDC. (*See* Abell Decl. ¶ 2.) For convenience, the court will cite to the bates-stamped page numbers of the medical record, omitting any preceding zeros, going forward.

during sick call.  (Def. R. 56.1 Stmt. ¶ 17; BOP45.)  The
following day, July 20, 2006, Dr. Beaudouin examined plaintiff,
and plaintiff complained of blood in his urine but stated it was
painless.  On the same day, Dr. Beaudouin referred plaintiff to
an urologist and requested that the urologist provide "a summary
of [the] assessment and [a] plan to facilitate patient's follow
up care" to the MDC.  (Def. R. 56.1 Stmt. ¶ 19; BOP18
(defendant's notes dated July 20, 2006), 99-100 (defendant's
referral of plaintiff to Dr. Wolfson, urologist).)  In addition,
defendant prescribed plaintiff medication and, with plaintiff's
permission, requested plaintiff's medical records from
University-Hospital, located in Newark, New Jersey, where
plaintiff had previously been treated.  (Def. R. 56.1 Stmt. ¶¶
19-20; BOP18, 140.)  These records, which indicated that
plaintiff was previously diagnosed with internal hemorrhoids,
were faxed to Dr. Beaudouin on August 1, 2006, and reviewed by
defendant on August 4, 2006.  (Def. R. 56.1 Stmt. ¶ 21; BOP127,
130).)

On August 31, 2006, plaintiff was examined by
Physician's Assistant ("PA") Mitchell[5] and reported that, one
week earlier, he had seen again seen blood and pus in his urine,
and a test of plaintiff's urine that day confirmed the presence
of blood.  Although PA Mitchell observed a mass on plaintiff's

_____
[5] The court is unable to locate PA Mitchell's first name in the record.

rectum, plaintiff refused an exam.  (Def. R. 56.1 Stmt. ¶ 23;
*see also* BOP14-15 (PA Mitchell's treatment notes dated August
31, 2006), 118 (a form signed by plaintiff acknowledging his
refusal of the rectal exam, despite PA Mitchell's advice).)
Plaintiff followed up with Dr. Beaudouin during a September 6,
2006 sick call and stated that he observed only occasional blood
in his urine.  (Def. R. 56.1 Stmt. ¶ 24; BOP16-17.)  Defendant's
notes indicate that he referred plaintiff to a
gastroenterologist on the same day.  (Def. R. 56.1 Stmt. ¶ 25;
BOP17.)

  Beginning on September 21, 2006, plaintiff began to
be treated by Dr. Wolfson at NYDH.  (Def. R. 56.1 Stmt. ¶ 26.)
During this initial visit, Dr. Wolfson performed an examination
and a renal and pelvic sonogram and observed two masses
consistent with bladder cancer on plaintiff's bladder wall
(referred to as polypoid lesions).  (Def. R. 56.1 Stmt. ¶ 26,
BOP97, 99 (sonography report).)  Plaintiff was advised to follow
up in two weeks with a cystoscopy and urine cytology.  (Def. R.
56.1 Stmt. ¶ 27.)  Dr. Beaudouin reviewed the results of the
sonogram on September 22, 2006.  (*Id.* ¶ 28; BOP97, 99.)  On
October 5, 2006, Dr. Wolfson performed a cystoscopy on Mr.
Urena, which revealed two bladder lesions.  (Def. R. 56.1 Stmt.
¶ 29, BOP95.)  On October 6 and October 9, 2006, respectively,
Dr. Goldstein of the MDC referred plaintiff for a transurethral

resection of the bladder tumor (a procedure called "TURBT") and a biopsy, and Dr. Beaudouin referred plaintiff for an abdominal and pelvic CT-scan. (Def. R. 56.1 ¶¶ 30-31; BOP93-94.) On October 30, 2006, the CT scan was carried out and, on November 2, 2006, the TURBT procedure and biopsy were performed by Dr. Wolfson. (Def. R. 56.1 Stmt. ¶¶ 33-34; *see also* BOP30-31 (CT-scan report).) Dr. Beaudouin reviewed the CT-scan results on November 7, 2006 and ordered an MRI of Mr. Urena's abdomen and pelvis. (Def. R. 56.1 Stmt. ¶¶ 36-37; BOP13, 30-31.)

The day after the TURBT, November 3, 2006, Mr. Urena was discharged from the NYDH and returned to the MDC. (Def. R. 56.1 Stmt. ¶ 35; BOP88-92 (discharge paperwork).) On or around the time that plaintiff was returned to the MDC, he began to be housed in the West Tower. (Def. R. 56.1 Stmt. ¶ 38; *see also* Beaudouin Decl. ¶ 6.) Defendant did not treat prisoners in the West Tower in 2006, and did not see or treat plaintiff after plaintiff's return to the MDC on November 2, 2006. (*Id.*; Beaudouin Decl. ¶ 7.) Dr. Beaudouin was, however, involved in reviewing or signing off on plaintiff's records on three occasions after November 2, 2006. First, as noted previously, on November 7, 2006, defendant received by facsimile and reviewed the results of the CT-scan he had ordered while plaintiff was in his care and requested a follow-up MRI be performed on plaintiff. (Def. R. 56.1 Stmt. ¶ 36; *see also*

Beaudouin Decl. ¶ 10; BOP13.)  Second, on November 13, 2006,
defendant again signed the same CT-scan results when he received
a hard copy by mail.  (Beaudouin Decl. ¶ 10; BOP32.)  Finally,
on November 16, 2006, Dr. Beaudouin counter-signed the notes
made by PA Mitchell during an examination of plaintiff on
November 12, 2006.  (Beaudouin Decl. ¶¶ 12-13; BOP12.)  In
addition, Dr. Beaudouin noted that, at the time he counter-
signed the chart, plaintiff was again hospitalized at the NYDH.
(*Id.*)  Defendant avers that he signed Mitchell's notes because
when, as here, PAs "at the MDC take notes over the weekend
regarding an inmate's treatment or condition, they subsequently
ask a physician on staff to counter-sign during the following
week."[6]  (Beaudouin Decl. ¶ 12.)

Plaintiff returned to the NYDH on November 13, 2006,
after being seen by PA Mitchell and Dr. Goldstein, respectively,
on November 12 and November 13, 2006.  (Def. R. 56.1 Stmt.
¶¶ 42-44; BOP11-12.)  On November 15, 2006, Dr. Wolfson advised
Dr. Borecky of the MDC that plaintiff was suffering from a
perforation of the bladder wall and that plaintiff was refusing
the surgery to repair the perforation.  (*Id.* ¶ 44; BOP10.)  On
November 17, 2006, the surgery was performed with plaintiff's
consent, and plaintiff was discharged on November 22.  (*Id.*
¶¶ 45-46; BOP84-85.)

---

[6] November 12, 2006, the date of PA Mitchell's examination, was a Sunday.

There is no record of defendant having any involvement in plaintiff's care upon plaintiff's return to the MDC on November 3, 2006. In addition, plaintiff stated in his November 3, 2009 deposition in this case that he could not recall interacting with Dr. Beaudouin at the MDC or why Dr. Beaudouin in particular was named in his lawsuit. (*Id.* ¶¶ 55-57; Abell Decl. Ex. B, at 35-42, 49 (transcript of Mr. Urena's deposition).)

Plaintiff does not appear to dispute the facts set forth above, but asserts instead that defendant was responsible for plaintiff's care as the supervisor of other doctors at the MDC. (*See* Pl. Opp'n 12-18.) This argument will be addressed below.

## DISCUSSION

Plaintiff's sole remaining claim in this case is that Dr. Beaudouin was deliberately indifferent to plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution. As discussed in its December 6, 2010 Memorandum and Order, the court interprets plaintiff's complaint to allege that Dr. Beaudouin violated plaintiff's constitutional rights by (1) delaying and denying treatment to plaintiff prior to his first surgery at NYDH to remedy his bladder cancer; and (2) failing to adequately monitor plaintiff's recovery in between his first and second surgeries.

*Urena I*, 2010 WL 5057208, at *7.  For the reasons stated below,

plaintiff's claim is without merit, and the court enters summary

judgment in favor of defendant Beaudouin.

## I.    Summary Judgment Standard

The court must grant summary judgment "if the movant

shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement

is that there be no *genuine* issue of *material* fact."  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in

original).  The substantive law of the claim governs

materiality, because "[o]nly disputes over facts that might

affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment.  Factual

disputes that are irrelevant or unnecessary will not be

counted."  *Id.* at 248 (citation omitted).

The moving party carries the burden of demonstrating

"the absence of a genuine issue of material fact."  *FDIC v.*

*Great Am. Ins. Co.,* 607 F.3d 288, 292 (2d Cir. 2010) (quoting

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).  The court

must construe the facts in the light most favorable to the

nonmoving party and all reasonable inferences and ambiguities

must be resolved against the moving party. *Id.* Nevertheless, the nonmoving party may not rest merely on allegations or denials but must instead set out specific facts showing a genuine issue for trial. *See id.* ("To defeat a summary judgment motion, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation.") (internal quotation marks and citation omitted).

In evaluating plaintiff's submission in opposition to defendant's summary judgment motion, the court will construe plaintiff's arguments liberally. The Supreme Court has stated that "[a] document filed *pro se* is 'to be liberally construed,' and . . . must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *see also Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) ("We liberally construe pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest." (internal quotation marks and citations omitted)).

## II.  Eighth Amendment Deliberate Indifference Claim Standard

In his Amended Complaint, Mr. Urena alleges that Dr. Beaudouin violated plaintiff's Eighth Amendment rights by either

failing to provide medical care to plaintiff or by delaying in providing care. (Am. Compl. App'x ¶¶ 9, 21, ECF No. 45-2.) In order to maintain an action against an individual acting under federal law, such as Dr. Beaudouin, the complaint must be filed pursuant to *Bivens*, 403 U.S. 388 (1971). "A plaintiff bringing a claim under *Bivens* must allege that he has been deprived of a constitutional right by a federal agent acting under color of federal authority. Because the doctrine of *respondeat superior* does not apply in *Bivens* actions, a plaintiff must [also] allege that the individual defendant was personally involved in the constitutional violation." *Thomas v. Ashcroft*, 470 F.3d 491, 496 (2d Cir. 2006) (citing *Ellis v. Blum*, 643 F.2d 68, 85 (2d Cir. 1981); *Black v. United States*, 534 F.2d 524, 527-28 (2d Cir. 1976)).

As discussed previously, Mr. Urena's specific claim pursuant to *Bivens* is that defendant violated his rights under the Eighth Amendment of the United States Constitution. The Eighth Amendment provides that "cruel and unusual punishments [shall not be] inflicted." An Eighth Amendment claim may be brought against a prison official based on failure to provide adequate medical care. *See, e.g.*, *Walker v. Schult*, 717 F.3d 199, 123 n.5, 125 (2d Cir. 2013) ("[P]rison officials violate the Constitution when they deprive an inmate of his basic human needs, such as food, clothing, medical care, and safe and

sanitary living conditions." (internal quotation marks and citation omitted)).

An Eighth Amendment claim against prison officials arising out of allegedly inadequate medical treatment requires proof of "deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 104. To establish deliberate indifference rising to "a constitutional violation under the Eighth Amendment, an inmate must meet both an objective and a subjective requirement." *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999).

Under the objective prong, the plaintiff must establish that an "official denied treatment needed to remedy a serious medical condition." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996). "The objective prong is divided into two subparts. 'The first inquiry is whether the prisoner was actually deprived of adequate medical care . . . . Second, the objective test asks whether the inadequacy in medical care is sufficiently serious.'" *Barnes v. Ross*, 926 F. Supp. 2d 499, 505 (S.D.N.Y. 2013) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)). A medical need is sufficiently serious to meet the objective standard where it is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998)).

Under the subjective prong of the analysis, the plaintiff must prove that that the official denied treatment with a "sufficiently culpable state of mind." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). This requires that the prison official "'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* at 66 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). To demonstrate this prong of the deliberate indifference standard, officials must "'intentionally deny[] or delay[] access to medical care or intentionally interfere with the treatment once prescribed.'" *Demata v. New York State Corr. Dept. of Health Servs.*, No. 99-0066, 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999) (quoting *Estelle*, 429 U.S. at 104-05). The Second Circuit has reserved classifying delays in providing necessary medical care as "deliberately indifferent" for "cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years." *Id.* (citations omitted).

Allegations of medical malpractice alone do not state a claim that an Eighth Amendment violation has occurred. *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (citing *Chance v.*

*Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)); *see also Estelle*,
429 U.S. at 106 ("Medical malpractice does not become a
constitutional violation merely because the victim is a
prisoner.  In order to state a cognizable claim, a prisoner must
allege acts or omissions sufficiently harmful to evidence
deliberate indifference").

## III. Application

As discussed in the court's prior orders, plaintiff
challenges the care he received from Dr. Beaudouin prior to his
first surgery, which took place on November 2, 2006, and in
between his first surgery and second surgery, which took place
on November 17, 2006.  Defendant does not appear to dispute that
Mr. Urena's medical needs were serious; however, Dr. Beaudouin
does dispute that Mr. Urena's care was inadequate or that he
acted with deliberate indifference to plaintiff's medical needs.

### a. Treatment Provided Prior to Plaintiff's First Surgery

There is no indication in the record, including the
voluminous medical record, that plaintiff was in fact deprived
of adequate medical care prior to his first surgery on November
2, 2006.  Defendant has submitted an expert report opining that
the care plaintiff received was adequate.  (*See* Decl. of Robert
A. Klein, M.D. ("Klein Decl."), ECF No. 213).)  Specifically,
Dr. Klein, who is board certified in internal medicine and
gastroenterology and who reviewed plaintiff's medical records,

16

avers that the "level of care provided to Mr. Urena by the medical personnel at the MDC was appropriate." (Klein Decl. ¶ 4; *see also* Klein Decl. Exs. A (Dr. Klein's *curriculum vitae*) and B (Dr. Klein's report dated Dec. 3, 2013).)

The court can similarly discern no instance in the record where Dr. Beaudouin failed to provide care to plaintiff or delayed in treating him. For example, on the same day plaintiff began to complain about blood with bowel movements and in his urine on June 7, 2006, Dr. Beaudouin treated plaintiff for hemorrhoids and followed up with blood work on July 14, 2006. Dr. Beaudouin reviewed the blood work on July 15, 2006 and noted that plaintiff should follow up in sick call. (Def. R. 56.1 Stmt. ¶¶ 15-17.) Dr. Beaudouin also examined plaintiff on July 20, 2006, the day after he reviewed plaintiff's urinalysis results, and referred plaintiff to an urologist for a cystoscopy and requested a follow-up care plan for the MDC medical staff to follow. That same day, Dr. Beaudouin also requested that plaintiff provide a medical release for plaintiff's records from University Hospital from 2005 to the present. (*Id.* ¶¶ 19-20.) Defendant reviewed plaintiff's University Hospital records on August 4, 2006. (*Id.* ¶ 21.) Plaintiff was examined by PA Mitchell on August 31, 2006 for his complaints of blood and pus in his urine the previous week, and plaintiff denied other urinary symptoms at that time. A urine

dipstick was positive for blood on that date. (*Id.* ¶ 23.) Dr. Beaudouin next referred plaintiff to a gastroenterologist on September 6, 2006, the same day that plaintiff stated he "felt fine" and that he saw occasional blood in his urine about once a month. (*Id.* ¶¶ 24-25.) On September 22, 2006, Dr. Beaudouin reviewed plaintiff's examination and treatment notes from Dr. Wolfson at NYDH and followed up with referrals on October 9 for CT scans of plaintiff's abdomen and pelvis, which took place on October 30, 2006, and blood work on October 12, 2006. (*Id.* ¶¶ 28, 31, 32.) Dr. Beaudouin reviewed the CT scan results and requested a follow up MRI on plaintiff's abdomen and pelvis on November 7, 2006, even though he did not see plaintiff because he was housed in Tower B, a different area of the MDC, and under the care of a different medical team upon his return to MDC after his surgery. (*Id.* ¶¶ 36-38.)

The foregoing record establishes that defendant treated plaintiff, and that there were no significant delays attributable to defendant in plaintiff's receipt of treatment. Furthermore, even if Dr. Beaudouin had failed to adequately treat plaintiff, there is no evidence at all in the record that he acted intentionally to deprive Mr. Urena of medical care. *See Salahuddin*, 467 F.3d at 281-82 (holding that where a doctor cancelled a liver biopsy because he mistakenly believed that

plaintiff was not at risk of liver disease, no Eighth Amendment violation had occurred).

Plaintiff raises no issues of material fact and does not refute the conclusions in Dr. Klein's report, nor does he address anywhere in his opposition the level of care he received prior to the November 2, 2006 surgery. Because the uncontroverted record establishes that plaintiff received adequate medical care, he is unable to state an Eighth Amendment claim, and summary judgment must be granted in favor of defendant regarding the treatment plaintiff received from Dr. Beaudouin prior to his November 2, 2006 surgery. *Cf. Chance*, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.")

### b. Treatment Provided Between Plaintiff's First and Second Surgeries

It does not appear, other than his review of plaintiff's CT-scan and his signing off on PA Mitchell's examination notes, that Dr. Beaudouin was involved in plaintiff's care after plaintiff returned to the MDC on November 3, 2006 following his first surgery on November 2. Rather, it appears from plaintiff's medical records that PA Mitchell and

Dr. Goldstein examined plaintiff prior to the second surgery on November 17, 2006, and that Dr. Wolfson advised Dr. Borecky of the MDC about plaintiff's condition. (Def. R. 56.1 Stmt. ¶¶ 42-44.)

Plaintiff asserts that, whether or not Dr. Beaudouin personally treated plaintiff during this period, defendant was responsible for the alleged failures of other MDC medical staff. (*See, e.g.*, Pl. Opp'n 13, 15.) Plaintiff's argument is unsupported and thus unavailing. A *Bivens* claim must be based on the personal involvement of a defendant in the allegedly unconstitutional act. *See Thomas*, 470 F.3d at 496 ("Because the doctrine of *respondeat superior* does not apply in *Bivens* actions, a plaintiff must allege that the individual defendant was personally involved in the constitutional violation."); *see also Singletary v. Tomarken*, No. 13-CV-4727, 2013 WL 6531083, at *2 (E.D.N.Y. Dec. 13, 2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003)) ("For a supervisor to incur liability based on the conduct of subordinates [in *Bivens* and Section 1983 suits], it is not enough for plaintiff to show that defendant was in charge of other actors who actually committed the violation. . . . Nor is the supervisor responsible for violations of which [he] had no knowledge."). In any event, there is no evidence in the record that Dr. Beaudouin supervised the other doctors at the

MDC. Accordingly, because there is no genuine issue of material fact that Dr. Beaudouin was not responsible for treating plaintiff between plaintiff's two surgeries, plaintiff's Eighth Amendment claim regarding this time period fails. Summary judgment is therefore granted in favor of defendant.

## CONCLUSION

For the foregoing reasons, defendant Beaudouin's motion for summary judgment is granted in its entirety. The Clerk of Court is respectfully requested to enter judgment in favor of defendant and to close the case. Additionally, the government is requested to mail a copy of this order and the judgment to the plaintiff at his current address and note service on the docket within one business day of the entry of judgment.

**SO ORDERED.**

**Dated**:    September 16, 2014
             Brooklyn, New York

                                    _____/s_____
                                    **KIYO A. MATSUMOTO**
                                    United States District Judge